Filed 8/6/21  P. v. Colley CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>THADEUS EUGENE COLLEY,<br><br>　　　Defendant and Appellant. | A159631<br><br>(Contra Costa County<br>Super. Ct. No. 5-190042-2) |

Defendant Thadeus Eugene Colley appeals a judgment entered upon a jury verdict finding him guilty of second degree murder.  He contends that the trial court erred in refusing to instruct the jury on the lesser included offense of voluntary manslaughter, that the court abused its discretion in excluding evidence of the victim's prior possession and use of guns and ammunition, and that the instruction regarding flight created a mandatory presumption that defendant killed the victim.  We agree with defendant that the jury should have been instructed on voluntary manslaughter and that the error was prejudicial.  We shall therefore reverse the judgment.  For the guidance of the trial court on remand, we consider and reject defendant's remaining contentions.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Events Leading up to the Crime

The victim of the crime, Jamaa Anderson, lived in Richmond with his father, Earnest Anderson, his mother, his daughter and son, and his nephew, Andreas Anderson.[1] Jamaa shared a room with his daughter and son. The family kept a camper in front of the house.

Defendant is Earnest's great-nephew. Defendant and Jamaa were close in age and had known each other since they were children. Defendant drove at least two vehicles, including a copper or brown Honda or Acura Legend and a silver Audi.

Andreas testified that a few days before Jamaa's death, he, Jamaa, and defendant were socializing in the camper. Defendant was using Jamaa's iPad. While they were in the camper, defendant pulled out a gun from his waist area and set it down. Andreas was uncomfortable and left the camper. That evening, Andreas and Jamaa left the house together to do a family errand, leaving defendant outside the house, using the iPad. When they returned ten or 15 minutes later, defendant was gone and the iPad was missing.

### II. The Night of the Crime

On October 31, 2018, Andreas went to bed around 9:00 or 10:00 in the evening. He was awakened during the night by a knock on the window, and he got up and opened the front door, where he saw defendant. Defendant told Andreas to get Jamaa; when Andreas told him Jamaa was asleep, defendant raised his voice a little bit and told him again to go get Jamaa. Andreas went

---

[1] Because several of Jamaa Anderson's family members share the same last name, we will refer to them by their first names. We intend no disrespect.

to Jamaa's room and woke him up.  Jamaa was wearing only pajama pants or sweatpants, with no shirt or shoes.  He appeared "sleepy, tired, woke up and confused."  He had nothing in his hands, and Andreas did not see a weapon anywhere on his person.  Andreas went into the bathroom, and Jamaa went toward the front door through the dining room.

Andreas remained inside the house.  He heard Jamaa and defendant's voices; the voices got louder, and he heard defendant yell, "Open the camper." He could not hear what Jamaa was saying, but he knew they were arguing and "getting into it."  There were sounds as if they had collided or started to fight.  Andreas then heard two gunshots.

Earnest testified that at approximately 1:00 a.m. on November 1, 2018, he was awakened by the sound of two loud voices arguing downstairs.  He recognized the voices as belonging to Jamaa and defendant.  He heard Jamaa say something like, "[W]here is my iPad[?]" then "a bunch of mumbling and grumbling," then a commotion, "almost like the ground was moving like an earthquake," as if they were fighting on the porch, and then two gunshots. Immediately before the gunshots, Earnest heard a voice that sounded like Jamaa's saying, "Oh, no."  After that, it was quiet.  Earnest did not hear a car drive away.

Earnest called out to Andreas and told him to go outside and find Jamaa.  Andreas did so and saw Jamaa face down, still breathing.  He came back and told Earnest Jamaa was lying outside and seemed to be bleeding from the head, and Earnest called 911.  At the operator's instruction, Andreas went outside to put Jamaa onto his back, and he saw that Jamaa had been shot in the head.  Jamaa was taken to a hospital, and he died the next day.

A neighbor testified that he heard two gunshots, with "weird" timing between them, then within minutes heard a car pull out of the driveway very quietly. He heard no voices.

Officer Wentz of the Richmond Police Department, who came to the scene, asked Andreas whether Jamaa had a gun when he left the house, and Andreas said, "No, I don't think so." Wentz asked Andreas whether he had seen anything in Jamaa's hands, and Andreas said there was nothing in his hands. Andreas told Officer Wentz about the incident with the iPad, but he did not mention defendant had a gun at the time. Andreas testified that he told the officers who came to the scene that Jamaa was angry at defendant for having stolen his iPad and that he had said he wanted to go to Oakland to get it back.

The officers did not test Andreas for gunshot residue. They searched the front yard and found no firearms.

There was evidence that defendant's behavior had changed in the weeks leading up to the killing. Veronica T., who was in a romantic relationship with defendant, testified that around the end of September or beginning of October 2018, defendant began covering electronic items in his home with towels, and on one occasion he took someone's phone and threw it. He showed jealousy and accused Veronica of looking at other men, and she heard he had accused her—falsely—of being in a relationship with Jamaa. Claudja D., a former romantic partner with whom defendant remained friendly, testified defendant began to say strange things, for example that he could hear whispers from outside or that his phone and television were watching him. Late on the night of October 31, 2018, defendant called Claudja and asked her repeatedly where she was. There was also testimony, albeit contested, that defendant told her in this call that he had "found the

person that was getting information out of his phone." Shortly afterward, Claudja received a call telling her Jamaa had been shot.

An autopsy showed Jamaa died of a wound to his head caused by a shotgun. Small birdshot pellets were recovered from his brain. Among his injuries, he had lacerations at the base of the thumb and index finger of his left hand, injuries the pathologist speculated were consistent with a gun being yanked or ripped out of the hand of someone who was holding its front sights. Jamaa also had injuries that could have been the result of a physical fight or a fall.

## III.   The Investigation

A detective viewed a video from a neighbor's surveillance system. The only vehicle traveling toward the Andersons' home between 1:00 and 1:22 a.m. on November 1, 2018 appeared to be an Acura Legend, moving at a normal speed. The detective testified that the vehicle was "like a tan or a light beige," but he acknowledged it was difficult to discern the color on the video. The vehicle reappeared, headed away from the house, at 1:33 a.m., and moving faster. Police cars appeared on the surveillance video shortly afterward.

Defendant had keys to an Audi and an Acura with him when he was arrested, as well as Jamaa's iPad.

On the porch of the house police found a bullet as well as a fragment of "jacketing," described as "the sheath that goes around the bullet that often separates after a bullet is shot." Jose Villalobos, an expert in firearms and ammunition, testified that the jacketing fragment "match[ed] up" with the larger bullet, that they were the same color, and that the combined weight of the bullet and fragment were consistent with a .44 or .45 caliber bullet.

There were bullet holes on the front metal screen door and the exterior wall of the home. Another prosecution witness testified that the holes were caused by a shot that appeared to have been fired from outside the house, by someone who was close to the ground. Villalobos opined that the bullet fragmented when it hit the metal screen door.

Alex Taflya, an expert in firearms and ammunition, testified that the bullet found outside the house was either .44- or .45-caliber, although his original view had been that it was more likely .44-caliber. Based on the markings on the bullet, he opined that the bullet was most likely fired from a revolver, though it could have been from a handgun other than a revolver. Taflya searched a database for guns that could have produced those markings and obtained a list of 28 firearms, which included revolvers, pistols, and rifles. One was a Taurus Judge revolver, which can fire either a .45-caliber cartridge or a .410-gauge shotgun shell that can be loaded with birdshot. The Taurus Judge can be loaded with both .45-caliber cartridges and .410 shotgun shells at the same time, and the firearm would still operate normally. According to Taflya, the Taurus Judge is illegal in California and he has seen it only rarely in his work. Moreover, when he was able to borrow a Taurus Judge from another law enforcement agency and test-fire it, the land and groove impressions left on a bullet were not consistent with the bullet found on Jamaa's porch, although this did not dissuade Taflya from his conclusion that the bullet found of Jamaa's porch could have been fired from a different Taurus Judge revolver.

## IV. Defense Evidence

Celia Hartnett, an expert in forensic sciences who testified on behalf of defendant, opined that the bullet found on Jamaa's porch was not fired by a Taurus Judge. According to Harnett, the bullet was .44-caliber, which was

not compatible with a Taurus Judge.  Second, the shallow rifling of the Taurus Judge produces light impressions on a bullet fired through it, and the projectile in evidence had clearly marked impressions.  Harnett opined that two bullets, not one, had caused the damage to the door and wall of the house and that the bullet fragment found at the scene did not come from the bullet police recovered.  She testified that the larger bullet was fired by a revolver but that the fragment was too badly damaged to determine whether it came from a revolver or a semiautomatic weapon.  In her view, at least two firearms were involved in the case.

Harnett also testified that the injuries on Jamaa's left thumb and forefinger were most consistent with a "slide bite" injury, which occurs when the recoiling slide of a semiautomatic pistol pinches the webbing between a person's thumb and forefinger as the part slides back to eject the cartridge.  Harnett had seen similar injuries in other cases and thought this a more likely explanation for Jamaa's injuries than grabbing the front site of a weapon, given the symmetry in the two injuries.  Detective Mandell explained that slide bite injuries most often occur when a shooter holds a semiautomatic weapon improperly while firing.

Melvina Gin, an expert in gunshot residue examination and analysis, examined samples from Jamaa's hands and found several particles consistent with gunshot residue and one particle commonly associated with gunshot residue; such particles may indicate—but not prove—a person has discharged a firearm; she concluded, however, that the evidence of gunshot residue was "inconclusive," because there were no "characteristic" particles.  The data sheet accompanying the samples indicated they were not collected for seven days, during which Jamaa had gone to the hospital and his remains had been

taken to the morgue, an interval that could have caused some gunshot residue to be lost.

An officer who arrived at the scene initially thought a shot had been fired out from the inside of the house, based on what appeared to be a projectile hole in the front screen door.

Defendant did not testify, nor did any other witness recount out-of-court statements he had made about Jamaa's death.

## V. Verdict and Sentence

Defendant was charged with murder (Pen. Code, § 187, subd. (a)), with an allegation that he personally and intentionally discharged a firearm, causing death (Pen. Code, § 12022.53, subd. (d)). The jury found him not guilty of first degree murder but guilty of second degree murder, and found the firearm enhancement true.

The trial court sentenced defendant to a prison term of 15 years to life for the murder, with an additional 25 years for the firearm enhancement, for a total term of 40 years to life.

## DISCUSSION

## I. Instruction on Voluntary Manslaughter

Defendant contends the trial court erred in refusing his request to instruct the jury on voluntary manslaughter.

"A party is entitled to a requested instruction if it is supported by substantial evidence. [Citation.] Evidence is '[s]ubstantial' for this purpose if it is 'sufficient to "deserve consideration by the jury," that is, evidence that a reasonable jury could find persuasive.' [Citation.] At the same time, instructions *not* supported by substantial evidence should not be given. [Citation.] 'It is error to give an instruction which, while correctly stating a principle of law, has no application to the facts of the case.' " (*People v. Ross*

(2007) 155 Cal.App.4th 1033, 1049–1050.) The court must give instructions on lesser included offenses "when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged." (*People v. Breverman* (1998) 19 Cal.4th 142, 154 (*Breverman*).)

We "review the evidentiary support for an instruction 'in the light most favorable to the defendant' [citation] and should resolve doubts as to the sufficiency of the evidence to warrant instructions ' "in favor of the accused." ' " (*People v. Wright* (2015) 242 Cal.App.4th 1461, 1483 (*Wright*).)

Manslaughter is the unlawful killing of a human being without malice. (Pen. Code, § 192.) "A defendant lacks malice and is guilty of voluntary manslaughter in 'limited, explicitly defined circumstances: either when the defendant acts in a "sudden quarrel or heat of passion" ([Pen. Code,] § 192, subd. (a)), or when the defendant kills in "unreasonable self-defense"—the unreasonable but good faith belief in having to act in self-defense [citations].' " (*People v. Blakeley* (2000) 23 Cal.4th 82, 87–88.) Unreasonable or imperfect self-defense is thus "one form of voluntary manslaughter, a lesser included offense of murder," and the court must instruct on imperfect self-defense whenever the evidence would allow a jury reasonably to conclude the defendant acted in such a belief. (*People v. Mejia-Lenares* (2006) 135 Cal.App.4th 1437, 1446.)

Defendant argues the evidence was sufficient to support an inference that he acted in the unreasonable but good faith belief he needed to defend himself. For support he points to the evidence that the shooting was preceded by a loud argument in which Jamaa asked defendant where his iPad was, then a physical struggle. And, he points out, there was evidence, albeit contested, that there was likely more than one gun at the scene, in the

form of evidence that at least two different types of bullet were used during the altercation, that Jamaa had a "slide bite" injury consistent with having fired a semiautomatic firearm, that Jamaa had gunshot residue on his hands, and that an officer initially thought a bullet was fired from inside the home. This evidence, he contends, would support an inference that Jamaa started the fight because defendant had taken his iPad and that defendant shot Jamaa in an unreasonable belief he had to do so to defend himself.

While the evidence is not overwhelming, we bear in mind that we must view it in the light most favorable to defendant and resolve in his favor any doubts about the sufficiency of the evidence to support the instruction. (*Wright*, *supra*, 242 Cal.App.4th at p. 1483.)  The evidence shows Jamaa argued with defendant, that he loudly asked about his iPad, and that they then engaged in a physical fight.  The specifics of how that fight started are unknown, but we know the fight was violent:  Earnest testified that he could hear them "tumbling and stuff," and it was "almost like the ground was moving like [an] earthquake."  This evidence could have led a properly instructed jury to conclude that one reasonable inference was that Jamaa started a violent physical fight, leading defendant to believe he had to defend himself with deadly force.  The jury could also have reasonably inferred from the evidence that there may have been a second gun at the scene and Jamaa may have fired it, leaving a bullet on his porch and a slide bite on his hand and provoking defendant to respond with deadly force.

The Attorney General argues that, in the absence of evidence as to how the fight actually happened, there was no evidence from which the jury could have concluded Defendant believed he was in mortal danger.  But where the issue of imperfect self-defense is " 'properly presented' in a murder case [citation], the *People* must prove *beyond a reasonable doubt* that these

circumstances were *lacking* in order to establish the murder element of malice." (*People v. Rios* (2000) 23 Cal.4th 450, 462.) The Attorney General argues the evidence from Jamaa's hands—of a slide bite injury and particles consistent with gunshot residue—is ambiguous, but to the extent a reasonable interpretation of the circumstantial evidence points to defendant's innocence, the jury is required to adopt that interpretation. (See *People v. Anderson* (2007) 152 Cal.App.4th 919, 931–932.) While the prosecutor's firearms expert testified the different kinds of ammunition found at the scene could have been fired from a single weapon, the jury was entitled to credit instead the defense expert's testimony that there were at least two firearms used, and to conclude that Jamaa had likely used one of them. The question is not whether sufficient evidence supports the verdicts, but whether sufficient evidence could also support a contrary view.

Finally, although these ambiguities in the evidence would be relevant to any self-defense claim—perfect or imperfect—there is also evidence uniquely probative of imperfect self-defense. At the time of the homicide, Defendant appears to have been suffering some serious paranoia, as evidenced by the testimony of his two female friends. Defendant has not argued that self-defense completely excuses his crime, so we need only address whether the evidence was sufficient to support his claim of imperfect self-defense. In the circumstances of this case, we find that the trial court should have instructed the jury on imperfect self-defense and voluntary manslaughter, so that the jury could determine whether the People had proven malice beyond a reasonable doubt.

The Attorney General argues that, even if the trial court erred in not instructing the jury on voluntary manslaughter, there was no prejudice because there is no reasonable probability the error affected the outcome.

(*Breverman, supra*, 19 Cal.4th at pp. 165, 178 [failure to instruct sua sponte on lesser included offense in noncapital cases is subject to state standards of reversibility]; *People v. Watson* (1956) 46 Cal.2d 818, 836.) Defendant contends the error deprived him of his federal constitutional right to present a defense and is subject to the standard of *Chapman v. California* (1967) 386 U.S. 18, 24, under which we reverse unless the error was harmless beyond a reasonable doubt.

Under either standard, we agree with defendant that the error requires reversal. The Attorney General contends there was no prejudice because the evidence that defendant was the killer was strong and because defendant's actions in arguing with Jamaa then fleeing the scene rather than aiding him suggest consciousness of guilt for murder. But a theory of imperfect self-defense presupposes that defendant was the killer and, as we have discussed, the evidence of an altercation is consistent with defendant believing he had to defend himself. While—as we discuss below—the jury could consider defendant's flight from the scene in determining his guilt, we are not persuaded that evidence undermines a theory that he killed in unreasonable self-defense and then fled the scene.

We also note that in finding defendant guilty of murder only in the second degree, the jury necessarily found a reasonable doubt as to whether he acted willfully, deliberately, and with premeditation, but it was not allowed to consider whether he acted with a lower—although still criminal—degree of culpability. Specifically, the jury was instructed it could find defendant acted with implied malice if he intentionally committed an act whose natural and probable consequences were dangerous to human life, he knew of the danger, and he deliberately acted with conscious disregard for life; but the jury was *not* instructed that one who acts in unreasonable self-defense is deemed to

have acted without malice. (See *People v. Mejia-Lenares*, *supra*, 135 Cal.App.4th at p. 1446.) On these facts, we conclude there is a reasonable probability a properly instructed jury would have concluded there was a reasonable doubt as to whether defendant acted with malice.

We must therefore reverse the judgment on this basis. For the guidance of the trial court on remand we will also address on the merits defendant's remaining contentions.

## II. Exclusion of Evidence

### A. Background

Before trial, the prosecution moved in limine to exclude evidence of Jamaa's prior possession of firearms, ammunition, or clips. The evidence at issue consisted of three items: First, Jamaa's ten-year-old daughter had stated Jamaa had had a firearm for protection, but she had not seen it for an unspecified amount of time and she was clear he did not have a firearm the night of the shooting. Second, Andreas had stated he had seen Jamaa with a clip and ammunition on prior occasions. Third, in May 2015, Jamaa discharged a weapon in his neighborhood, then called 911. He told police he fired a gun into his lawn because he feared for his safety when a group of men approached his house, yelling obscenities, and one of the men grabbed his waistband as if he had a firearm. Jamaa was arrested for a violation of Penal Code section 246.3, discharge of a firearm in a grossly negligent manner. The neighbors refused to provide statements at the scene. One of them later came to the police department requesting information on how to obtain money as the victim of the violent crime, but her husband refused to provide a statement and no charges were ever filed.

At the hearing on the motion, the prosecutor argued that evidence of the 2015 incident should be excluded because examination of the

circumstances would be time-consuming and have little probative value due to the differences in the circumstances between that event and Jamaa's death. Noting both those differences and the three-year gap between the 2015 incident and the homicide, the trial court ruled that evidence of that incident was inadmissible.

The court went on, however, to say that if there were evidence that Jamaa was armed or possessed weapons or ammunition around the time of the homicide, that evidence would be relevant. The court noted that it was not clear from the portions of the interview with Jamaa's daughter that it had reviewed whether she had seen him with a gun around the time of the 2015 incident or more recently; the court accordingly suggested someone speak with Jamaa's daughter to find out when and how long she lived with him before the homicide. Defense counsel also pointed out that Andreas had testified at the preliminary hearing that he saw ammunition and a clip and that he had told the officers about them; the court indicated Andreas could testify about that at trial, but asked counsel to find out how long before the homicide Andreas had seen those items.

The next day, the prosecutor told the court that Andreas had told an investigator that he saw magazines and ammunition in Jamaa's room a year before the shooting. The court indicated that a year was too remote in time to be relevant. Defense counsel had not been able to contact Jamaa's daughter, whose mother was apparently refusing to talk to defense counsel. The court indicated that it would revisit the issue of the daughter's testimony if further investigation showed she had seen Jamaa with a gun more recently, and the court offered the use of a private room at the courthouse for defendant's investigator to speak with her.

*B. Analysis*

Evidence Code section 1103, subdivision (a)(1)[2] provides an exception to the general rule against the admission of character evidence to prove conduct on a specified occasion; this exception exists when a defendant offers evidence regarding the character of the victim of a crime "to prove conduct of the victim in conformity with the character or trait of character." This evidence is subject to exclusion under section 352 if its admission would confuse the issues at trial, unduly consume time, or be more prejudicial than probative. (*People v. Gutierrez* (2009) 45 Cal.4th 789, 827–828.) "The trial court must always perform its gatekeeping function pursuant to Evidence Code section 350 to exclude evidence that is irrelevant." (*Gutierrez*, at p. 828.) We review the trial court's exclusion of evidence under section 1103 for abuse of discretion, and review its balancing under section 352 with deference; "the trial judge is in the cockpit, with a clearer view of the whole situation and a better ability to apply practical and timely wisdom." (*People v. DelRio* (2020) 54 Cal.App.5th 47, 53, 57 (*DelRio*).) With this deference in mind, we conclude there was no abuse of discretion in the trial court's exclusion of this evidence.

The 2015 incident took place more than three years before the events at issue in this case, and the firearm Jamaa used was registered to his then-wife, with whom he was not living in October 2018. The trial court characterized the circumstances of the 2015 incident as "muddy on both ends," which seems a fair characterization of an incident that may have been a legitimate act of self-defense, and about which it would have been difficult to get reliable information at trial. In our view, the court could reasonably conclude that any probative value was outweighed by the possibility of

---

[2] All undesignated statutory references are to the Evidence Code.

confusion and undue consumption of time in exploring the events of May 2015.

As for the evidence that Jamaa's daughter and Andreas knew Jamaa to have had a gun or ammunition in the past, we are not persuaded the court's balancing exceeded the bounds of its discretion. First, there would have been nothing illegal or inherently aggressive about Jamaa merely owning or possessing a firearm in his own home. (See *District of Columbia v. Heller* (2008) 554 U.S. 570.) Second, the court indicated that if there were evidence Jamaa possessed such items "within a reasonable period of time" before the shooting, the court would consider such evidence relevant and admissible. But after the parties made inquiry, it appeared there would be no evidence that Jamaa possessed a firearm or ammunition within the year leading up to his death, although the court left the door open for Defendant to determine Jamaa's daughter would so testify. Third, the court was told there was evidence that Jamaa did *not* have a gun on his person when he left his bedroom clad only in pajama pants; Jamaa's daughter had told an interviewer he had nothing in his hands when he left the room, and Andreas had also said he did not see a weapon in Jamaa's hands.

This case is thus unlike *DelRio*, upon which Defendant relies. The defendant there and the victim were involved in a two-man shootout that left the victim dead. (*DelRio*, *supra*, 54 Cal.App.4th at pp. 48–49.) The trial court excluded evidence of three instances of the victim's past domestic violence on the ground the defendant did not know about them so they could not have influenced his actions. (*Id*. at pp. 54–55.) The appellate court reversed, explaining the trial court's analysis was incorrect as a matter of law because the defendant's knowledge of the past acts was not germane to the question of whether the victim acted violently at the scene. (*Id*. at pp. 55–

56.)  It went on to explain the trial court would have abused its discretion had it excluded the evidence under section 352:  the evidence that the victim was by nature violently aggressive was potentially highly probative because both men had loaded guns, both fired at each other, and there were no independent witnesses to corroborate or refute the defendant's testimony that the victim drew his gun first, leaving the defendant in fear of his life.  (*DelRio*, at pp. 49–50, 56–57.)  The circumstances here are different.  Although the trial disclosed evidence that two different types of ammunition were used during the incident—supporting a possible inference there were two guns—the only direct evidence was that Jamaa did *not* have a gun when he went to speak with Defendant.  More importantly, none of the evidence of Jamaa's prior gun possession established that Jamaa had a character for violence, as opposed to a propensity for armed, but legal, self-defense.  On this record, the trial court did not abuse its discretion in excluding evidence that Jamaa had possessed a firearm or ammunition a year or more in the past.

Defendant contends exclusion of the evidence deprived him of the right to present a theory that he acted in self-defense when he shot Jamaa, thus depriving him of his constitutional right to present a defense.  But application of the ordinary rules of evidence does not implicate due process.  (*People v. Marks* (2003) 31 Cal.4th 197, 226-227.)  Although "completely excluding evidence of an accused's defense theoretically could rise to [the] level [of impermissibly infringing on the right to present a defense], excluding defense evidence on a minor or subsidiary point does not impair an accused's due process right to present a defense." (*People v. Fudge* (1994) 7 Cal.4th 1075, 1102–1103.)  Evidence of Jamaa's possession or use of guns or ammunition a year or more in the past falls within the scope of a subsidiary

point, and the court's rulings did not prevent defendant from presenting evidence to support an inference that two guns were present at the scene and that the violent physical fight that preceded the shooting could also have caused Defendant to believe he was in imminent danger of death or serious bodily injury.

We emphasize the deference with which we review a trial court's weighing under Evidence Code section 352. Nothing we say here is intended to preclude Defendant from arguing for, or the trial court from granting, admission of the evidence in a retrial. Here we go no further than to decide that there was no abuse of discretion in the trial court's rulings.

## III.    Instruction on Flight

Section 1127c of the Penal Code provides that where evidence of flight is relied upon as tending to show guilt, the court should instruct the jury substantially as follows: "The flight of a person immediately after the commission of a crime, or after he is accused of a crime that has been committed, is not sufficient in itself to establish his guilt, but is a fact which, if proved, the jury may consider in deciding his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine."

The trial court instructed the jury pursuant to CALCRIM No. 372: "If the defendant fled immediately after the crime was committed, that conduct may show that he was aware of his guilt. If you conclude that the defendant fled, it is up to you to decide the meaning and importance of that conduct. However, evidence that the defendant fled cannot prove guilt by itself."

Defendant contends this instruction impermissibly created a mandatory presumption that he was the person who was present at the scene and who fled from the scene and therefore undermined his defense of

mistaken identity.  That is because, he argues, the instruction—unlike Penal Code section 1127c—refers to "the defendant" rather than "a person," and because it does not explicitly instruct the jury to find identity before applying the instruction.  In considering such a challenge, "we examine the jury instructions as a whole, in light of the trial record, to determine whether it is reasonably likely the jury understood the challenged instruction in a way that undermined the presumption of innocence or tended to relieve the prosecution of the burden to prove defendant's guilt beyond a reasonable doubt." (*People v. Paysinger* (2009) 174 Cal.App.4th 26, 30.)

We reject defendant's challenge to CALCRIM No. 372.  Our high court has explained that it is proper to instruct on flight if there is evidence identifying the person who fled as the defendant and that evidence is relied upon to show guilt.  (*People v. Mason* (1991) 52 Cal.3d 909, 943.)  " 'The jury's need to know these things does not change just because identity is also an issue.  Instead, such a case [only] requires the jury to proceed logically by deciding first whether the [person who fled] was the defendant and then, if the answer is affirmative, how much weight to accord to flight in resolving the other issues bearing on guilt.' " (*Ibid*.; accord, *People v. Elliott* (2012) 53 Cal.4th 535, 584; *People v. Abilez* (2007) 41 Cal.4th 472, 522.)

Similarly here, the instruction did not create a presumption that defendant was the person who fled the scene; rather, the jury would logically infer consciousness of guilt from flight only if it first concluded defendant was the person who left the scene.  Although the jury was not expressly told to make such an initial determination, we see no reason to think the jury would have done otherwise.  Defendant seeks to distinguish *Mason* on the ground that the instruction here referred specifically to flight by "the defendant," rather than by "a person," but we are not persuaded that the jury would

reasonably have interpreted the instruction to create a presumption that defendant was in fact the person who was present at the scene.

## DISPOSITION

The judgment is reversed. The matter is remanded for further proceedings consistent with the views expressed in this opinion.


TUCHER, J.

WE CONCUR:

STREETER, Acting P. J.
BROWN, J.


*People v. Colley* (A159631)